UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

SANDRA LINDSEY,

        Plaintiff,

        v.                                                Case No. 04-C-0087

ST. PAUL FIRE AND HOME INS. CO.,
METLIFE AUTO AND HOME INSURANCE CO.,
SCOTT WITTLIFF,
LEE HEATING, COOLING & APPLIANCE,
MATRIX FINANCIAL SERVICES CORPORATION,
and THE CITY OF RACINE,

        Defendants.

---

ORDER DENYING MOTION TO LIMIT DISCOVERY, GRANTING MOTIONS TO COMPEL, DENYING MOTIONS TO STAY DISCOVERY, DENYING MOTIONS TO DISMISS FOR FAILURE TO COMPLY WITH DISCOVERY RULES, GRANTING MOTION FOR PROTECTIVE ORDER, DENYING MOTION TO DISMISS CITY OF RACINE'S MOTION, DENYING MOTIONS FOR SANCTIONS, AND DENYING MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff, Sandra Lindsey, representing herself, filed this case concerning the condition of her house and the settlement of her insurance claim for weather related damage. In the Amended Complaint,[1] Lindsey invokes 42 U.S.C. § 1983 and the First, Fifth and Fourteenth Amendments, asserting that the defendants conspired to discriminate against her and to deny her due process and equal protection of the law. (Am. Compl. (Doc. #44) at 1.)

---

[1] The Amended Complaint filed June 24, 2004, is the operative pleading in this case. In the court's order of March 1, 2005, the court denied motions to amend and noted that a document filed February 15, 2005, and titled "Final Revised Amended Complaint," was a nullity. (Order of 3/1/05 at 7 n.2.) To clear up the record, the court now notes that all answers filed in response to that null pleading are of no effect as well, and therefore will strike them. The operative answers are those filed in response to the June 24, 2004 Amended Complaint.

        Lindsey also filed a "Filing of Amended Pleadings and Joiner [sic] of Parties" on May 2, 2005, but later withdrew that submission. In an order of June 16, 2005, the court noted that the answers to that purported pleading also became nullities as a result of the withdrawal.

According to the Amended Complaint, Lindsey, an African-American, insured her home in Racine, Wisconsin, through defendants St. Paul and MetLife and always paid her premiums. In January 1999 the home was damaged by a winter storm, and Lindsey contacted these insurers, who chose defendant Scott Wittliff as the claims adjuster. Thereafter, Wittliff told Lindsey to contact a contractor for a bid on necessary repairs. (*Id.* ¶¶ 1-3, 6-7, 22.)

Lindsey contacted a minority contractor named Adolph Hill, whom she trusted based on previous dealings. Hill estimated repair costs of $55,000. Wittliff rejected Hill's bid and demanded revisions and itemizations. Although Hill attempted to comply, Wittliff insisted that Lindsey find another contractor. When Lindsey complained to St. Paul and MetLife about Wittliff's allegedly unreasonable demands, she was told that Wittliff was in charge. (Am. Compl. ¶¶ 7-8.) Lindsey then sought bids from other contractors, who labeled Wittliff's requirements unreasonable and Wittliff rejected these bids as well. Finally, Lindsey contacted Keith McGilsky, whom Wittliff approved after over a year had passed. When Lindsey asked why she was not given a check in the amount of the damage calculated by Wittliff, he advised her that it was because she and Hill might run off with the money. (*Id.* ¶ 9.)

Defendant Matrix, which holds a mortgage on Lindsey's home, sent Lindsey a letter stating that Matrix had the right to receive settlement and disburse funds and to monitor the repair process. (*Id.* ¶ 11.)

Lindsey contracted with Shorewest Realty Company to sell the home after receiving what she believed to be a ratified contract for repairs to the property. Shorewest was told about the planned repairs and agreed to show the house to prospective buyers as

2

Case 2:04-cv-00087-CNC   Filed 03/08/06   Page 2 of 18   Document 191

soon as repairs were substantially underway. Lindsey then relocated to California, with the understanding that McGilsky would repair the home under Wittliff's supervision. (*Id.* ¶ 12.)

After a few months in California, Lindsey received reports from Shorewest and Hill that "her home was literally being ravaged by McGilsky." (*Id.* ¶ 13.) However, Wittliff and McGilsky assured her that repairs were proceeding satisfactorily. Nevertheless, Lindsey returned to Wisconsin in July 2001 due to the negative reports she received from others. (*Id.* ¶ 14.) Upon her return, Lindsey found that plumbing fixtures in the home had been removed, gutted walls had not been repaired, dry walling had been done with used materials or leftovers from McGilsky's other jobs, replaced pipes remained exposed, carved woodwork had been removed and replaced with cheap materials, and numerous antique fixtures had been removed or damaged. (*Id.* ¶ 15.) Further, Wittliff told Lindsey that St. Paul had rejected the contract that she had signed and added that he was working under a contract between St. Paul/Wittliff and McGilsky, to which Lindsey was not a party. (*Id.* ¶ 16.)

According to the Amended Complaint, Wittliff issued several checks to other defendant contractors, who performed work on her home although they were not approved by Lindsey or and did not perform professional work. (*Id.* ¶ 17.) Some of the checks bore Lindsey's forged signature.

When Lindsey confronted Wittliff regarding the condition of her home, he responded: "Ha ha ha! Your two-year statu[t]e of limitation[s] is up–now you can't sue us!" (*Id.* ¶ 18-19.)

Lindsey asserts that St. Paul and MetLife, through their agent Wittliff, discriminated against her and subjected her to harassment and "psychological pressures in [their] quest to force her to accept . . . unfair and inadequate compensation for her losses."

3

(*Id.* ¶ 23.) She maintains that they disbursed settlement funds to other entities, including Matrix, improperly. (*Id.* ¶¶ 24-25, 28.) Further, Lindsey alleges that St. Paul and MetLife issued a check in Lindsey's name for over $20,000 and sent it to Matrix, which forged her name and cashed the check without her knowledge or consent. (*Id.* ¶ 28.) Moreover, Lindsey charges that St. Paul and MetLife issued numerous checks to various contractors, that over $79,000 in settlement funds have been disbursed, that none of the money was ever received by Lindsey and that her home "remains a wreck; unrepaired." (*Id.* ¶ 34.) Allegedly, defendant Lee's Heating received $5,000 of the funds for fixing Lindsey's heating, but the heating does not work properly. (*Id.* ¶ 40.)

According to Lindsey's Amended Complaint, white homeowners have not had their settlement funds diverted as hers have been, and the defendants are treating her in this manner because of her race and gender. (*Id.* ¶¶ 27, 35.) Lindsey asserts that Wisconsin law requires settlement funds for damaged single-family dwellings to be paid directly to the insured rather than to other entities. (*Id.* ¶ 26.) Further, she asserts that St. Paul and MetLife deprived her of her property without due process of law. (*Id.* ¶ 29.) Lindsey submits that St. Paul and MetLife refused to investigate her complaints about Wittliff's discrimination, denying her due process. (*Id.* ¶ 30.)

Lindsey alleges that as a result of the defendants' discriminatory actions, she has been forced to live in a home without, among other things, plumbing, a stove, refrigeration, and lighting. (*Id.* ¶ 41.) Lindsey maintains that she continues to suffer injury from the unsafe condition of her home and has contracted a respiratory ailment from the moldy walls and moist bathroom. (*Id.* ¶ 36.) She adds that she is in debt, as the contractors charged building materials under her name without her knowledge. (*Id.* ¶ 42.) Further,

4

Lindsey asserts that she has presented defendants St. Paul, MetLife, and Wittliff with a list of over $20,000 worth of personal property that was damaged or destroyed and covered by her policy, yet she has not been compensated. (*Id.* ¶ 33.)

> According to the Amended Complaint, the City of Racine (City)
>
> aided the conspiracy to deny her equal protection and due process (discrimination) by issuing inspection reports and findings that alleged that some code violations in the plaintiff's home were not the result of the storm damage . . . so as to absolve defendant St. Paul / MetLife of liability and responsibility to repair those damages; however, these findings we allege, were in bad faith which is evidenced by the fact that *defendant City of Racine has not inspected the plaintiff's property during the past 5 years!*

(*Id.* ¶ 37.) Lindsey says that when she was responsible for the condition of her home, the City regularly inspected the home, but since St. Paul, MetLife, Matrix, and Wittliff have been involved, no inspections have been conducted. (*Id.* ¶ 38.) Lindsey

> alleges that defendant City of Racine knew that plaintiff's home has had many code violations for the past 5 years including no kitchen and bathroom or insulation around doors and windows, no electrical outlets or light fixtures in bathroom, kitchen and living room, gutted walls in bathroom and bathroom plumbing that floods from upstairs unit down into the lower bathroom unit but that defendant Racine has continually raised the plaintiff's property taxes and has taken no action against the other defendants because of the plaintiff's race.

(*Id.* ¶ 39.)

PLAINTIFF'S MOTION TO LIMIT DISCOVERY AND DEFENDANTS' MOTIONS TO
COMPEL DEPOSITION TESTIMONY, STAY DISCOVERY, OR DISMISS FOR FAILURE
TO COMPLY WITH DISCOVERY OBLIGATIONS

Plaintiff seeks an order prohibiting any of the defendants from deposing her. She says she suffers from extreme stress, which is exacerbated by confrontations with defense counsel. She indicates that the defendants set up numerous times for her to be

deposed but she was unable to keep them due to illness and doctors' appointments. According to Lindsey, on June 28, 2005, she appeared at a scheduled deposition "despite being desperately ill." (Mot. to Limit Disc. at 2.) She "offer[ed] proof to the Defendant[s] that she was much too sick to effectuate the discovery hearing" by providing them with a digital reading of her blood pressure. (*Id.*) According to Lindsey, defense counsel laughed and made snide remarks to her and demanded that she proceed with the deposition rather than go to the hospital. (*Id.*) When she arrived at the hospital she was informed by clinic staff that the court had called, asking for the doctor. Lindsey contends that the defendants "have consistently, obstinately, refused to accept that the Plaintiff is a human capable of being sick, too sick, much to[o] sick to be subjected to the stress of oral depositions any time soon." (*Id.*) She also notes that her various medications "would detract from [her] ability to think cogently" at any deposition. (*Id.*)

Attached to the motion is a note from the clinic staff member saying that the court had called about a deposition, as well as a doctor's note dated July 12, 2005. The doctor's note is addressed to this court. It states that Lindsey is under the doctor's care for chronic medical conditions and that "[d]ue to her aggravated psychiatric and physical state she is unable to continue her court meetings until she is stable." (*Id.*, Ex. 1.)

Lindsey's deposition was set to occur on June 28, 2005. At the appointed time and place, at least four attorneys, representing the various defendants, appeared at the offices of Schoone, Leuck, Kelley, Pitts & Knurr, S.C. in Racine, Wisconsin. (Arrowood Aff., Ex. A at 2.) Lindsey appeared but informed the attorneys that she did not feel well and wanted to reschedule. She said her blood pressure was too high and that she was "deathly

6

sitting here." (*Id.* at 4.) The transcript shows the following exchange before Lindsey left the deposition:

> MS. WOCHOS: Ms. Lindsey, I'm the one that noticed up the deposition, and I am not going to voluntarily cancel it. Obviously I can't keep you here if you feel that you need to leave and can't go through with it. That's certainly your decision.
>
> We had set this deposition for a month ago. You had a family member call and say that you could not participate at that time. I personally called and left messages on your voice mail –
>
> MS. LINDSEY: Okay.
>
> MS. WOCHOS: – asking for times when you could reschedule.
>
> MS. LINDSEY: If you could just reschedule it.
>
> MS. ARROWOOD: Well, the problem, Ms. Lindsey –
>
> MS. LINDSEY: I'm the one sitting here and dying. I know you people don't care.
>
> MS. ARROWOOD: – you have canceled it. And we're under a scheduling order, and we're under strict deadlines from the Court.
>
> MS. LINDSEY: Yeah, see, you should have let me – like I told you, I was going to inform you of when I was feeling better and come in here. That's why I brought this here, so that you can see that I'm sick. I'm not sitting up in here –
>
> MR. KNURR: Hey, Sandra?
>
> MS. LINDSEY: – with no blood pressure 234.
>
> . . . .
>
> MS. LINDSEY: . . . I will inform you when the doctor says that my blood pressure is low enough to deal with all these pressures that I'm up under. I will inform you and be within your time frame.

(*Id.* at 5-6.)

The Motion to Limit Discovery will be denied. Lindsey chose to file this lawsuit and must prosecute it. She cannot bring a lawsuit and then avoid the discovery that results. Defendants are entitled to obtain plaintiff's sworn statements about her claims, in answer to their questions. As set forth in Fed. R. Civ. P. 26(a)(5), parties may obtain discovery through various methods, at their discretion and choice. Although Lindsey argues that defendants could use a process other than oral deposition to obtain their discovery, the court is not going to limit the defendants in such a way. Further, the court finds it difficult to imagine how Lindsey can present her case without testifying or speaking in court.

A protective order to prevent annoyance, embarrassment, oppression, or undue burden or expense, by prohibiting the discovery or by specifying its terms and conditions, is within the court's power. *See* Fed. R. Civ. P. 26(c). But the court is not persuaded by Lindsey's arguments that such a protective order is necessary here. Lindsey has appeared in court previously. Submitting to a deposition should be no more stressful than appearing in court. In some of her submissions Lindsey discusses presentation of her case at trial. (*See, e.g.*, Addendum to Disclosure Listing (Doc. #154) at 1.) If she considers herself capable of presenting a case at trial, she is capable of sitting through a deposition.

Lindsey's testimony is crucial to the case; a protective order would perhaps be appropriate for a lesser witness, but she is the plaintiff. She is the primary source for defendants to discover the basis for her claims. Her case concerns contacts she had with contractors, defendant Scott Wittliff, and the insurance companies, as well as the damage to her home. Moreover, Lindsey is the best witness to present evidence regarding her claims, and deposition testimony rather than written interrogatories or deposition questions is likely

8

the best method for defendants to obtain essential information, as a deposition provides give and take in questioning that is unavailable through written questions.

Further, the doctor's note does not suggest that a deposition would be impossible after Lindsey's health stabilized, but just that "court meetings" could not continue "until she is stable." (Mot. to Limit Discovery, Ex. 1.) At some point Lindsey must have become stable. In addition, the court is unpersuaded that the doctor was fully aware of the factual requirements of a deposition such that he could assess whether Lindsey was able to be deposed. Also, it is unclear what the doctor thought "court meetings" encompassed. Finally, Lindsey's participation in the case since the doctor's note – by filing her motions and oppositions to defense motions – undercuts the doctor's opinion and shows that her condition is such that she can participate in this case.

Although Lindsey complains that her medication prevents her from being competent for a deposition, she appears fully able to serve interrogatories on the defendants and to file papers with this court. And finally, the transcript of statements from the terminated deposition shows no abusive language or snide comments by defense counsel. (Arrowood Aff., Ex. A at 2-9.)

For these reasons, the court will not limit discovery by prohibiting the taking of Lindsey's deposition. The court notes for the record that neither it nor its staff members called any clinic about Lindsey.

Defendants St. Paul Fire and Home Insurance Company; MetLife Auto and Home Insurance Company; Scott Wittliff; Lee Heating, Cooling & Appliance; and Matrix Financial Service Corporation move for dismissal of the case based on Lindsey's failure to

9

submit to a deposition, or, alternatively, an order compelling deposition testimony or a stay of other discovery. (Doc. #165, #166, #168.)

Lindsey's failure to submit to her deposition caused defendants substantial costs for the four attorneys' time and the court reporter. Such a deposition is not easily rescheduled, and the plaintiff in a case is not free to dictate such rescheduling at her own convenience. In one of her briefs, Lindsey says she informed the defendants that the best way to schedule the deposition was to allow her to contact them when she was feeling well. (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. to Limit Disc. at 9.) That would be logistically impossible based on the number of attorneys involved in this case. The court understands that Lindsey may not have been feeling well on June 28, but it was incumbent on her to make herself available at *defense counsels'* convenience as soon as possible thereafter. Instead, she filed a motion to prohibit the taking of her deposition completely.

However, dismissal for the canceling of the deposition would be too drastic a sanction at this time. Lindsey may not have realized what result canceling her deposition could have. Plus, at the time she canceled the deposition she was not violating a court order compelling her to testify. (*See* Fed. R. Civ. P. 37(b)(2) ("If a party . . . fails to obey an order to provide or permit discovery, the court . . . may make such orders in regard to the failure as are just, [including dismissal].") Consequently, the court concludes that the defendants' motions to compel should be granted. Then, if Lindsey fails to comply with the court order, the defendants may again move to dismiss this case as a sanction for the failure to provide discovery, failure to obey the court order and failure to prosecute the case. *See* Fed. R. Civ. P. 37(b), 41(b).

10

The defendants' motions to stay discovery will be denied as moot, for the reasons stated above. The previously ordered deadline for discovery has now passed and Lindsey's right to obtain discovery is over.

## MOTION FOR PROTECTIVE ORDER

Matrix moves for a protective order regarding a second set of interrogatories. Lindsey served twenty-one interrogatories on Matrix on or about June 14, 2005. (Zablocki Aff. for Prot. Order ¶ 2, Ex. A.) Matrix answered those interrogatories. (*Id.*, Ex. B.) Lindsey then served an additional twenty-five interrogatories on Matrix on or about August 4, 2005. (*Id.* ¶ 4, Ex. C.) The second set is not a duplicate of the first set, with minor changes; there are substantial changes and new questions. For instance, several new questions concern Matrix's contacts with Keith McGilsky. (*See id.*, Ex. C ¶¶ 4-11.)

Lindsey opposes the motion saying that Matrix objected to several of the first interrogatories and did not answer them fully. But whether the interrogatories or responses were proper does not affect the rule regarding their number. Federal Rule of Civil Procedure 33(a) states that interrogatories must not exceed twenty-five in number. If Lindsey thought Matrix's answers were insufficient, she should have conferred with Matrix's attorney about the matter and then, if they were unable to reach an agreement, possibly move to compel answers. *See* Civil L.R. 33.1(c). However, she failed to do so. (Zablocki Aff. for Prot. Order ¶¶ 5-6.) If Lindsey needed more interrogatories, she had to seek leave from the court. Fed. R. Civ. P. 33(a). She did not. Therefore, the motion for protective order will be granted.

11

## MOTION TO DISMISS CITY OF RACINE'S MOTION AND MOTIONS FOR SANCTIONS

Lindsey moves to "dismiss" the motion for judgment on the pleadings or for summary judgment filed by the City of Racine, "on grounds that said motion is frivolous on its face and procedurally premature because the City of Racine has failed to meet its Rule 26 discover[y] obligations." (Mot. to Dis. Summ. J. Motion at 1.) She seeks monetary sanctions against the City of Racine on similar grounds, i.e., "that the City of Racine has filed a frivolous and perhaps procedurally deficient summary judgment motion while (at the same time) having willfully failed to respond to the plaintiff[']s interrogatory demands." (Mot. for Sanctions at 1.)

The motion to "dismiss" the City's motion will be denied. Lindsey's filing is really an opposition brief, not a motion. Further, the City is entitled to file a dispositive motion. *See* Fed. R. Civ. P. 8, 12, 56. And finally, the City's motion is not frivolous. "Frivolous" means that no reasonable person could suppose the argument to have any legal merit. *See Lee v. Clinton*, 209 F.3d 1025, 1026 (7th Cir. 2000). The City's motion is based on the issue of res judicata, because Lindsey lost an earlier case against the City of Racine relating to her Racine property. Although the City's motion and supporting brief are perhaps not detailed enough for Lindsey to understand the exact issue, the question of res judicata is certainly not frivolous. And if the City has not responded to discovery requests, Lindsey could have filed a motion to compel after conferring with defense counsel as required by Civil Local Rule 37.1.[2]

---

[2]Civil Local Rules 37.1 states:

All motions for discovery pursuant to Fed. R. Civ. P. 26 through 37 must be accompanied by a written statement by the movant that, after personal consultation with the party adverse to the motion and after sincere attempts to resolve their differences, the parties are unable to reach an accord. the

12

## MOTION FOR JUDGMENT ON THE PLEADINGS

The City of Racine moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), although it confusingly cites to summary judgment procedure and provides proposed findings of fact and an affidavit, in accordance with summary judgment motion practice rather than Fed. R. Civ. P. 12(c). However, the affidavit merely introduces documents filed in the case of *Lindsey v. City of Racine*, Case No. 04-C-107 (E.D. Wis. filed Jan. 29, 2004). This court can take judicial notice of those documents, so no formal conversion of the Rule 12(c) motion to a summary judgment motion is necessary. *See* Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994).

The City argues that Lindsey is precluded from pursuing her present claim against it because she has previously lost a case against the City. According to the City,

> the allegations contained in all of her pleadings in both cases arise out of the very same circumstances, series of transactions, series of events, persons involved, allegations of misconduct and discrimination, etc. There is no substantive or substantial difference between the complaints filed against the City of Racine in either of the actions.

(Br. in Supp. of Mot. for J. on the Pldgs. at 2-3.) However, the City is not specific about which type preclusion – claim or issue – applies. Instead, the City just lumps both forms of preclusion (using both names for each type of preclusion) into one brief argument:

> The very same issues and allegations have been litigated in the form of a Motion for Summary Judgement [sic] concerning which Sandra Lindsey was not able to defeat. As such, the ruling of the Court in case number 04-C-0107 warrents [sic] the application of the legal principles of collateral estoppel, claim preclusion, issue preclusion, and/or res judicata.

---

statement must also recite the date and time of such conference and the named of all parties participating in it.

13

> Though each of the forgoing legal principles may have different nuances as to what must be established, as a general rule each would involve a situation where a plaintiff has had the opportunity to present a cause of action in a prior action, the same issue sought to be precluded were [sic] involved in the prior action, the issue was litigated to final judgement [sic], and a determination of the issue was essential to the final judgement [sic]. See e.g., *Adair v. Sherman*, 230F.3d890 [sic], 893 (7th Circuit [sic] 2000).

(Br. in Supp. of Mot. for J. on the Pldgs. at 3.) The City has collapsed two distinct doctrines and is rather vague regarding exactly how the present suit is barred.

Because the prior litigation was brought in federal court on a federal claim, the federal forms of res judicata (claim preclusion) and collateral estoppel (issue preclusion) doctrines apply. *Cent. States, Se. & Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002).

Under the doctrine of issue preclusion (a/k/a collateral estoppel), the determination of an *issue* by a court of competent jurisdiction is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Montana v. United States*, 440 U.S. 147, 153 (1979). Issue preclusion involves the identical nature of a claim or issue. *See Adair*, 230 F.3d at 893. Relitigation of an issue is barred under this doctrine if:

> (1) the issue sought to be precluded is the same as that involved in a prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was represented in the prior action.

*Id.*

In the present case, there is no question that the last element is met. Lindsey did sue the City of Racine in case 04-C-107 in this district. But application of the doctrine

14

otherwise fails at element (1). In the complaint in case 04-C-107, Lindsey sued the City of Racine and its tax assessor for discrimination, denial of due process and equal protection, and an unreasonable seizure of her property, all relating to the actions of the tax assessor. She asserted that the property was assessed grossly in excess of its true market value. Although the complaint did mention that Lindsey's home suffered storm damage and that a result her home presently lacked a toilet and other working plumbing fixtures and a roof that was not up to code, the cause of the poor condition of the property was not raised as an issue in the complaint. Instead, the issue was whether the City and its tax assessor discriminated against her in assessing her house at $84,000, when it should have been valued lower. The present case involves alleged discrimination against Lindsey by the City's inspectors, not the tax assessor, and the City inspectors' conspiracy with the insurance companies and other defendants to look the other way while the other defendants ravaged Lindsey's house. While the Amended Complaint mentions that Lindsey's property taxes have been raised, her actual claim is that the City's inspectors discriminated against her by failing to inspect or by colluding with the other defendants regarding inspections. Whether the tax assessor later discriminated against Lindsey in assessing her house following the actions of the inspectors is a separate matter. The tax assessment issue did not depend on resolution of any question regarding what caused of devaluation of the property, but just whether the property was not worth $84,000.

Under the doctrine of claim preclusion (a/k/a res judicata), a final judgment on the merits bars further claims by parties based on the same cause of action. *Montana*, 440 U.S. at 153. The elements of res judicata are: (1) an identity of the parties, (2) an identity of the cause of action, and (3) a final judgment on the merits. *Id.*; *Prochotsky v. Baker &*

15

*McKenzie*, 966 F.2d 333, 334 (7th Cir. 1992). The second element is met when two purported claims "are based on the same, or nearly the same, factual allegations." *Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223, 226 (7th Cir. 1993). In other words, "[t]wo claims arising from the same facts are one claim for res judicata purposes, and may not be split" by making them the subject of separate lawsuits. *Wilson v. City of Chicago*, 120 F.3d 681, 687 (7th Cir. 1997).

In *Herrmann*, a defendant argued that a claim of illegal discharge because of race and pregnancy was barred by res judicata because the plaintiff had already lost a claim regarding her COBRA benefits following her discharge. *See* 999 F.2d at 224. However, the court rejected any "but for" test to determine what constitutes a single cause of action -, i.e., the argument that but for her termination she would have neither claim. *Id.* at 226. It found that the second lawsuit was not barred because, when viewed at the right level of specificity, the claims did not arise from the same facts: "The COBRA suit concerns facts that arose *after* the plaintiff was fired and that therefore have [sic] no connection to the facts concerning racial and gender discrimination on which her Title VII claim is based, all of which occurred before (though some perhaps just before) she was fired." *Id.*

Here, the City did not discuss claim-splitting at all or the standard regarding what constitutes a single claim arising from the same facts, so Lindsey was not apprised of her need to respond regarding the issue. But based on the record of case 04-C-107 that the City has presented in this case, cause of action is not identical such that Lindsey is presenting the same case twice. Like the situation in *Herrmann*, it appears that Lindsey sues about conduct by the defendant that occurred in sequence, not at the same time. The argument that "but for" the damage to her house the tax assessment would not have been wrong will not fly.

16

Damage to Lindsey's house could have occurred due to fire, flood, tornado, the actions of the defendants in this case, or supernatural events. And, the tax assessor's valuation of the property could have occurred irrespectively of what gave rise to the underlying damage. The two cases do not evolve from the same facts. Consequently,

IT IS ORDERED that all answers to the null "Final Revised Amended Complaint," which was filed February 15, 2005, are stricken as having no legal effect.

IT IS ORDERED that plaintiff's Motion to Limit Discovery (Doc. #153) is denied.

IT IS FURTHER ORDERED that defendants' motions to dismiss and to stay based on Lindsey's failure to cooperate in discovery (Doc. #165, #166, #168) are denied.

IT IS FURTHER ORDERED that defendants' motions to compel deposition testimony (Doc. #165, #166, #168) are granted.

IT IS FURTHER ORDERED that Lindsey's motions to dismiss the City's motion and for sanctions (Doc. #178, #179) are denied.

IT IS FURTHER ORDERED that Lindsey must appear for her deposition within twenty-one days of this order, at a reasonable time and location chosen by defense counsel. Defense counsel shall move for dismissal of this case if Lindsey fails to appear for her deposition as ordered.

IT IS FURTHER ORDERED that Matrix's motion for protective order (Doc. #170) is granted and Matrix is not required to answer the second set of interrogatories.

IT IS FURTHER ORDERED that the City's motion for judgment on the pleadings is denied.

A letter filed September 9, 2005, indicates that the son of one of the attorneys for the insurance companies and Scott Wittliff has set a wedding date that conflicts with the

trial date. Considering that conflict, and substantial uncertainty regarding the future course of this litigation,

IT IS FURTHER ORDERED that the final pretrial conference and trial are postponed. New dates will be set when necessary.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge